## LUCY GOLDEN v. LERCH BROS. INC. AND OTHERS. GLOBE INDEMNITY COMPANY AND TRAVELERS INSURANCE COMPANY, GARNISHEES.[1]

August 1, 1941.

Nos. 32,640, 32,648.

See 203 Minn. 211, 281 N. W. 249.

*Holmes, Mayall, Reavill & Neimeyer,* for appellant Travelers Insurance Company.

*Faegre, Benson & Krause, Paul J. McGough,* and *Wright W. Brooks,* for appellant Globe Indemnity Company.

*Sexton, Mordaunt, Kennedy & Carroll,* for plaintiff-respondent.

*Thomas H. Strizich,* for defendants-respondents Abigail S. Lerch

[1]Reported in 300 N. W. 207.

as representative of George Lerch, deceased, Fred Lerch, and Lerch Brothers, a copartnership.

STONE, JUSTICE.

In Golden v. Lerch Bros. Inc. 203 Minn. 211, 281 N. W. 249, the plaintiff got judgment for damages suffered by her husband (who died after the verdict) as result of the negligence of Lerch Brothers, a copartnership. From 1915 to 1929, Mr. Golden was their employe. That negligence was the failure to provide him with a safe place to work. In consequence, he contracted the disease (from which he died January 29, 1935) of pneumoconiosis or silicosis with an end and fatal result of superimposed tuberculosis. He had quit his employment by Lerch Bros. Inc. in January 1930.

Lucy Golden, as special administratrix and substituted plaintiff in the original case, has assigned her judgments (there are two of them, one in the district court and one here for costs and disbursements) to Lerch Bros. Inc.[2] That corporation by garnishment now seeks to hold the garnishees, Globe Indemnity and Travelers Insurance Companies, liable as insurers of Lerch Brothers. The decisions below going against them, the garnishees severally appeal from the order denying their alternative motions for amended findings or a new trial.

The theory of recovery in Golden v. Lerch Bros. Inc. was narrow. The negligence charged was the violation of Mason St. 1927, § 4174. That statute required proper ventilation of the laboratory wherein Golden was employed so that dust arising therein from the crushing and treatment of ore samples would not become harmful to those employed.

Neither by pleadings nor evidence was there advanced on behalf of plaintiff in the original case the theory of accidental injury. That negative is not controlling, but it is enlightening. Recovery was based upon a finding of fact, implicit in the verdict, that be-

---

[2]Lerch Brothers operated as a copartnership until August 8, 1929, when the corporation was organized and took over the business.

cause of defendants' negligence Golden had become the victim of an insidious and slowly developing disease rather than accident.

The policies issued by the two insurers were identical in coverage. They are labeled "Standard Workmen's Compensation and Employers' Liability Policy." They insured the employer against loss by reason of "personal injuries sustained by employees, including death at any time resulting therefrom." After that initial statement, the coverage falls into two classes. The first insures generally against liability of the insured under any workmen's compensation law. That is the workmen's compensation side of the contract.

The other side has to do with the employers' liability coverage. In that respect, the insurer's promise is "to indemnify this employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed wherever such injuries may be sustained within the territorial limits of the United States of America." That promise of indemnity is subject to this limitation (paragraph VII of the policy): "This agreement shall apply *only* to such injuries so sustained *by reason of accidents* occurring *during the policy period* limited and defined as such in Item 2 of said Declarations," which are a part of the policy. Item 2, so referred to, makes no mention of accidents or other *cause of damage,* but is confined to limitations by terminal dates of *"the period during which* the Policy shall remain in force, unless cancelled." (Italics supplied.)

A condition of the policy, F, is that "this Employer, upon the occurrence of an accident, shall give immediate written notice thereof to the Company [insurer] with the fullest information obtainable." Another condition, D, makes an injured employe a beneficiary of the contract.[3] It declares that the contract, in re-

---

[3]In view of the fact that injured employes are so clearly beneficiaries of the policies, the query suggests itself why it was necessary in order to reach the insurers to resort to the circuitous route of garnishment rather than direct suit. La Mourea v. Rhude, 209 Minn. 53, 295 N. W. 304.

spect to injured employes, "shall not be affected by the failure of this Employer to do or refrain from doing any act required by the Policy; nor by any default of this Employer after the accident in the payment of premiums or in the giving of any notice required."

The insurers are liable, if at all, only if they insured the employer against damages to employes arising from chronic disease as well as those arising from accident. Since January 15, 1919, the Travelers have been off the risk, whatever it was.

The record in the Golden case is again before us. We do not repeat much of its facts. If Golden had quit the employ of Lerch Brothers January 15, 1919, concurrently with expiration of the last Travelers policy, there is no evidence that, as of that date or earlier, he had become afflicted with any disease. He may have been exposed, but to so slight an extent that, if the exposure had not been continued, there probably would have been no resulting disease.

As matter of law, the record, as against the Travelers, falls far short of showing damage arising from an insured risk incurred before January 15, 1919. At best, a finding against the Travelers on that issue would rest on conjecture rather than inference.

The Globe policies covered the risk continuously from January 15, 1919, to January 1, 1931. We hold that, inasmuch as Golden died of chronic disease which did not result from accident, the Globe company is not liable. That is because the insurance, other than that against liability for workmen's compensation, did not cover disability or death resulting from disease, but rather and *only*, "injuries * * * sustained by reason of accidents." Even the workmen's compensation insurance would have been confined to cases of accident except for its inclusion of all liability under the compensation law. That necessarily includes liability for any disease classed as occupational by the statute. Mason St. 1927 and 1940 Supp. § 4327. Silicosis and pneumoconiosis, with or without superimposed tuberculosis, are not so included.

The cases are in hopeless conflict.[4] Were we to follow those from Nebraska and Alabama,[5] our conclusion would be otherwise than it is. In accord with our view are cases from New York, New Jersey, Pennsylvania, Illinois, and the federal courts.[6]

Because of the conflict and resulting state of authority, we have given the whole problem the most thoroughgoing reëxamination of which we are capable.

The recovery of Golden against his employers was not under the compensation law. It was exclusively on their common-law liability for negligence. That tort functioned harmfully, not through or because of accident, but rather and exclusively by insidious and chronic disease, in the causation of which there was no accident. So, under paragraph VII of the policies, there is no liability on the insurer. That paragraph makes the policies apply "only" to injuries "sustained by reason of accidents." The language is too plain for reasonable debate. With or without application to its subject matter, there is no ambiguity. One of the least justifiable

[4]Cases similar to those cited herein are collected and discussed in Annotations, 112 A. L. R. 158; 35 A. L. R. 737; 52 A. L. R. 374; 64 A. L. R. 966; 30 L.R.A.(N.S.) 1192.

[5]Updike Inv. Co. v. Employers L. Assur. Corp. Ltd. 131 Neb. 745, 270 N. W. 107; American Mut. L. Ins. Co. v. Agricola Furnace Co. 236 Ala. 535, 183 So. 677. Compare Victory Sparkler & Specialty Co. v. Francks, 147 Md. 368, 128 A. 635, 44 A. L. R. 363; Bosworth v. Metropolitan L. Ins. Co. 114 W. Va. 663, 173 S. E. 780; King v. Travelers Ins. Co. 123 Conn. 1, 192 A. 311; Hoage v. Employers' L. Assur. Corp. Ltd. 62 App. D. C. 77, 64 F. (2d) 715. Similar contrary results were reached, but coverage was restricted by use of the word "accident" as an adjective rather than a noun, a material variation. See 25 Harv. L. Rev. 328.

[6]Taylor Dredging Co. v. Travelers Ins. Co. (2 Cir.) 90 F. (2d) 449; Globe Ind. Co. v. Sterling Stewart Corp. 283 N. Y. 582, 27 N. E. (2d) 441, affirming 257 App. Div. 1027, 13 N. Y. S. (2d) 678; United States Radium Corp. v. Globe Ind. Co. 13 N. J. Misc. 316, 178 A. 271. See Billo v. Allegheny Steel Co. 328 Pa. 97, 195 A. 110; Boal v. Electric Storage Battery Co. (3 Cir.) 98 F. (2d) 815; Peru Plow & Wheel Co. v. Industrial Comm. 311 Ill. 216, 142 N. E. 546; Jackson v. Employers' L. Assur. Corp. 139 Misc. 686, 248 N. Y. S. 207, affirmed, 234 App. Div. 893, 254 N. Y. S. 1010, affirmed, 259 N. Y. 559, 182 N. E. 180.

errors of the judicial process is its occasional creation of ambigui-
ties in contracts where none really exist. It is not for judges to
set up, or permit counsel to stuff for them, mere dummies whereon
to demonstrate skill with the dialectical bayonet.

Before proceeding, it is well to go to the factual roots of the
issue by examining again and somewhat in detail the nature of
Golden's fatal ailment. The medical testimony supporting re-
covery in the Golden case is illustrated by that of Dr. E. L.
Cheney, whose diagnosis, based on personal examination and X-rays,
was that Golden had "pneumoconiosis,[7] superimposed by a tuber-
cular trouble, tuberculosis infection, involving both lungs." He
said pneumoconiosis was not a germ disease. His opinion was that
"the men who work in dust-laden atmospheres, particularly certain
types of dust, over a period of years, are known * * * to be
found with this condition we call pneumoconiosis. That is the
effects of the dust particles on the lung tissues." He added that
the onset and progress of pneumoconiosis "is usually very slow."
The victim "can continue with his work for a long time with a
considerable degree of pneumoconiosis." The usual result is a
greater susceptibility to tuberculosis infection. Pneumoconiosis
"was the original foundation" of Golden's trouble. "He had the
pneumoconiosis first, and he had this respiratory infection [in-
fluenza] second, and then later on the definite tubercular infec-

[7]"A general term applied to chronic induration or fibrous inflammation
of the lungs due to the inhalation of dust. Various names are given to it
according to the kind of dust causing the inflammation; anthracosis, that
due to the inhalation of coal dust; siderosis, that due to inhalation of
metallic dust; chalicosis, that due to the inhalation of mineral dust."
Gould's Medical Dictionary (3 ed.).

Apparently there are three alternative spellings of the term for this
disease, viz., pneumoconiosis, pneumonoconiosis, and pneumonokoniosis. We
have adhered to the spelling used in our former opinion, viz., pneumo-
coniosis.

The same authority thus defines silicosis: "A deposit of particles of
silica in the tissues specifically, a chronic fibroid condition of the lung or
the bronchial lymphatic glands, produced by the inhalation of particles of
silica."

tion." Dr. Cheney's testimony was typical of all the medical opinion for the plaintiff. It showed a condition the beginning of which was not referable, within years, to any definite time or event. Its existence and progress were unknown for a long time. That demonstrates a cause the direct antithesis of accident.

As appears from medical definition, silicosis (which is but one sort of pneumoconiosis) does not result from infection by germ or bacillus. We who must dwell in cities are more or less continually exposed to pneumoconiosis. The lungs of many of us, under close inspection, might show the effects of anthracosis. Silicosis frequently is an "occupation disease," which is simply "one caused by the occupation of the patient." Gould's Medical Dictionary (3 ed.). That shows how irrelevant is the presence of tort as agency of causation. The cause of occupational disease has too often been the tortious neglect of employers in not furnishing employes with safe working premises. Such neglect is the target of our statute requiring proper ventilation of workrooms where, without it, employes would be subjected to the dangerous inhalation of noxious dusts or gases. Mason St. 1927, § 4174. So we cannot agree that what is otherwise and plainly an occupational disease is rendered nonoccupational by the wholly fortuitous circumstance that it is caused by an employer's tort. In contrast is American Mut. L. Ins. Co. v. Agricola Furnace Co. 236 Ala. 535, 183 So. 677.

Habitual conduct may be, occasionally is, a tort. But it is never an accident. Whatever else it may be, an accident is an event. As such, it must be susceptible of identification and reference to time, place, and result, with whatever degree of certainty a particular case may demand.

Habitual conduct, intentional as to performance but not as to harmful effect, cannot be an accident under any reasonable definition. His employer's subjection of Golden to work in an unventilated, dust-filled workroom was all along intentional and usual. It was tortious but not an accident. It was the cause of his disease. The latter was a fibroid condition of his lungs, insidiously

started and slowly continued through the chronic to the fatal stage, by his inhalation, through long hours of many working days, year after year, of minute air-borne particles of silica dust. Such a cause defies reasonable inclusion in any reasonable definition of accident. Accidents do not and cannot take years in the happening.

Neither the first nor any succeeding separate inhalation of silica dust can be perceived. It is a slow process rather than an event. Under insurance policies, an accident must be an episode of which notice can be given, followed by proof that it happened within the policy term. No inhalation of dust, unless it be so toxic as to result in acute disease, can be such an event. Neither can any succession of inhalations.

Disease, where it results, is of itself an event. But it is result rather than cause, and we are now concerned, as controlling decision, with cause alone. The disease as result is relevant only as it aids in identifying the cause so as to appraise the latter as accidental or not. At this point it helps consideration to observe the medical distinction between diseases which are acute and those which are chronic.[8] The former are characterized by sudden onset and so are frequently referable to accident as cause.[9] For example are cases of typhoid fever, Aetna L. Ins. Co. v. Portland Gas & Coke Co. (9 Cir.) 229 F. 552, L. R. A. 1916D, 1027; glanders, H. P. Hood & Sons v. Maryland Cas. Co. 206 Mass. 223,

[8]In medical terminology an "acute disease" is one "having a rapid onset, a short course, and pronounced symptoms and termination; not chronic. Sharp, severe." "Chronic" is the antonym of "acute." It means "long-continued; of long duration; opposed to acute." Gould's Medical Dictionary (3 ed.).

[9]But see State ex rel. Faribault Woolen Mills Co. v. District Court, 138 Minn. 210, 164 N. W. 810, L. R. A. 1918F, 855 (typhoid contracted from drinking water, held not an accident). Same as to pneumonia, Costly v. City of Eveleth, 173 Minn. 564, 218 N. W. 126. Both cases were controlled by the definition of "accident" in our workmen's compensation law. That definition is "an unexpected or unforeseen event, happening suddenly and violently, with or without human fault, and producing at the time injury to the physical structure of the body." Mason St. 1927, § 4326(h).

92 N. E. 329, 30 L.R.A.(N.S.) 1192, 138 A. S. R. 379; tetrachloride poisoning resulting in asthma, Globe Ind. Co. v. Banner Grain Co. (8 Cir.) 90 F. (2d) 774.

Chronic diseases, such as silicosis, have an insidious and always unrecognized beginning. They progress slowly for a long period, without suspicion of their presence. Moreover, the process of fibrosis, as we understand it, may be stopped, and, if attacked soon enough, it may not progress beyond the point where, without scientific examination, its presence will be known. We do not mean to imply that, on occasion, chronic disease cannot result from accident. Our impression is that cancer may be caused by a blow.

Because, in the tort for which damages were recovered in the Golden case, there was no accident, neither insurer is liable. So the order must be reversed with direction that judgment be entered for the garnishees.

So ordered.

GALLAGHER, CHIEF JUSTICE (dissenting).

I regret that I am unable to agree with the conclusions reached by the majority. The problem presented, as I view the case, has to do with the construction of ambiguous provisions in certain liability insurance policies. That the provisions here involved are ambiguous is evidenced by the fact that the courts which have passed upon the question disagree as to the construction to be given the policies. As stated by Mr. Justice Stone in the majority opinion, "The cases are in hopeless conflict." If courts cannot agree as to how these policies should be construed, laymen must be at a loss to know the nature and extent of the protection they are to get when they purchase liability insurance policies containing such provisions.

The facts are substantially as stated in the majority opinion. The question in the case is whether defendants in the present proceedings are liable for the damages for which Lerch Bros. were

held responsible in the main action. Golden v. Lerch Bros. Inc. 203 Minn. 211, 281 N. W. 249.

It is conceded that policies issued by defendant Travelers Insurance Company were effective during the period from June 14, 1914, to January 15, 1919, and that policies issued by the Globe Indemnity Company were effective from June 15, 1919, to August 13, 1929. It was determined in Golden v. Lerch Bros. Inc. *supra,* that the acts of negligence which caused Golden's injuries occurred between June 1917 and August 1929. The policies are in substantially the same form. The Travelers policy is similar to the one issued by Globe Indemnity Company, which is attached to and made a part of the record. The material parts read (the italicized and capitalized portions indicating the parts of the policy set out in extra black type):

"Globe

Indemnity Company

*(herein called the Company)*

Does Hereby Agree *with this Employer, named and described as such in the Declarations forming a part hereof, as respects personal injuries sustained by employees, including death at any time resulting therefrom as follows:*

I. (a) *To Pay Promptly* to any person entitled thereto, under the Workmen's Compensation Law and in the manner therein provided, * * *

I. (b) *To Indemnify* this Employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed wherever such injuries may be sustained within the territorial limits of the United States * * *

II. *To Serve* this Employer (a) by the inspection of work places covered by the Policy when and as deemed desirable by the Company and thereupon to suggest to this Employer such changes or improvements as may operate to reduce the number or severity of injuries during work,

and, (b) upon notice of such injuries, by investigation thereof and by settlement of any resulting claims in accordance with law.

III.  *To Defend* in the name and on behalf of this Employer, any suits or other proceedings which may at any time be instituted against him on account of such injuries, * * *

IV.  *To Pay* all costs taxed against this Employer in any legal proceeding defended by the Company, * * *

V.  *This agreement shall apply* to such injuries sustained by any person or persons employed by this Employer whose entire remuneration shall be included in the total actual remuneration for which provision is hereinafter made, upon which remuneration the premium for this Policy is to be computed and adjusted, and, also to such injuries so sustained by the President, any Vice-President, Secretary or Treasurer of this Employer, if a corporation. The remuneration of any such designated officer shall not be subjected to a premium charge unless he is actually performing such duties as are ordinarily undertaken by a superintendent, foreman or workman.

VI.  *This agreement shall apply* to such injuries so sustained by reason of the business operations described in said Declarations which, for the purpose of this insurance, shall include all operations necessary, incident or appurtenant thereto, or connected therewith, whether such operations are conducted at the work places defined and described in said Declarations or elsewhere in connection with, or in relation to, such work places.

VII.  *This agreement shall apply only* to such injuries so sustained by reason of accidents occurring during the Policy Period limited and defined as such in *Item 2* of said Declarations."

Item 2 of the Declarations reads:

"The period during which the Policy shall remain in force, unless cancelled as in the Policy provided (herein called the Policy Period), shall be from ..............., 192..., to ..............., 192..., at twelve and one minute o'clock a. m., standard time, as to each of said dates at the place where any operation covered hereby is conducted, as respects that operation, or at the place where any injury covered hereby is sustained, as respects that injury."

The trial court, among other things, found:

"15. That the injuries sustained by said James F. Golden were due to and resulted from the negligence of George Lerch and Fred Lerch, doing business under the firm name of Lerch Brothers, co-partnership, in failing and neglecting to provide for him a safe place to work and a place free from injurious dust containing silica and other foreign matter.

"16. That the employment of said James F. Golden and the place of employment where he was employed by the defendants, George Lerch and Fred Lerch, doing business under the firm name of Lerch Brothers, co-partnership, were covered by the contracts of insurance issued and delivered by the garnishees herein to said co-partnership; that the circumstances under which said James F. Golden sustained injuries as heretofore related entitled the insured, George Lerch and Fred Lerch, as such co-partners, to protection under the policies of insurance aforementioned and to be indemnified for the judgments they were compelled to pay.

"17. That the insurers herein were familiar with the nature of the work the said defendants, George Lerch and Fred Lerch, doing business under the firm name of Lerch Brothers, co-partnership, were engaged in and the type and nature of the work that was to be performed by their employees."

It determined that defendants were liable to plaintiff for the amounts paid by it in satisfaction of the judgments of this court and of the district court aggregating about $30,000.

The primary question for our determination is whether the policy provisions here involved present such an ambiguity as to require construction, and, if so, how they should be construed.

Defendants contend that the use of the word "accidents" in paragraph 7 of the policy so characterizes the terms "injuries" and "personal injuries" where they appear at other places of the policy as to limit recovery to injuries occurring strictly from accident as used in its narrower sense.

It is plaintiff's claim (1) that the word "accidents" as used in paragraph 7 does not characterize the terms "injuries" and "personal injuries" as used in other parts of the policy, but that it is used merely for the purpose of designating an occurrence and refers only to the limits of the policy, and (2) that, even though used to characterize the nature of the injuries, as claimed by plaintiff, the term includes the injuries sustained by Golden, the plaintiff in the main action.

The choice, as I view it, is between the narrow construction relied upon by defendants and the more liberal one contended for by plaintiff. It seems to me that under our previous decisions we are committed to the more liberal rule that "the language of a policy, being that selected by the insurer and for its benefit, must be clear and unambiguous, and any reasonable doubt as to its meaning must be resolved in favor of the insured." 3 Dunnell, Dig. & Supp. § 4659, and cases cited.

There is abundant authority to sustain plaintiff's contentions.

The supreme court of Missouri in Soukup v. Employers' L. Assur. Corp. Ltd. 341 Mo. 614, 108 S. W. (2d) 86, 112 A. L. R. 149, had occasion to pass upon the question herein involved. There an employe recovered from an employer in an action for damages for violation of a statute pertaining to health and safety resulting in the alleged contraction by the employe of lead poisoning. The employer carried a workmen's compensation and employer's liability policy similar to the one here involved but issued by another company. After judgment against the employer in the main action,

garnishment proceedings were instituted. The garnishee asserted the same claims asserted by defendants in this case. The trial court ordered judgment against the garnishee. On appeal by the garnishee the judgment was affirmed. The Missouri supreme court, after stating the claims of appellant and considering the decisions there relied upon by it, some of which are those here relied upon by defendants, said (341 Mo. 624, 108 S. W. [2d] 90, 112 A. L. R. 149):

"Those decisions do not, nor does the appellant, give heed or attach any significance to the important phrase 'personal injuries' iterated and reiterated in the policies, other than to assume that it is used in one and the same sense throughout and as thus used it connotes accident in the sense attributed to 'accident' in the compensation law—possibly under the merely ancillary rule of construction that a term repeatedly used in a written document may be presumed to have been used in the same sense, unless a proper consideration of the context or the document in its entirety otherwise may determine. We are of opinion that such employment of the term 'personal injuries' presents an ambiguity requiring a legal construction of the policies."

After analyzing the pertinent provisions of the policy causing the ambiguity, the court reached the conclusion (341 Mo. 627, 108 S. W. [2d] 92) that clause 7 was applicable to and restrictive of clause 1(b) "in so far only as it fixes the limits of the policy period, while it is wholly applicable to clause 1(a)" (the workmen's compensation provision). It also construed the word "accident" as there used to include lead poisoning, which it held to be an occupational disease. The court said (341 Mo. 627, 108 S. W. [2d] 92):

"In arriving at the foregoing conclusions we have, after considering the policies as a whole and in all their parts, sought to ascertain what was the main purpose or object of the parties to the contracts in making them and to effectuate their intention by the application of settled legal principles of interpretation, in sub-

stance, viz.: No substantive clause should be allowed to perish by construction unless unsurmountable obstacles stand in the way of any other course; looking to the instrument as a whole, courts should give such construction that each clause will have some effect and perform some office; seeming contradictions must be harmonized, if that course is possible; a construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent (6 R. C. L., p. 835)."

In the later case of Tomnitz v. Employers' L. Assur. Corp. Ltd. 343 Mo. 321, 121 S. W. (2d) 745, the same court had before it a case involving injuries caused by silicosis. Garnishment proceedings were resorted to in an effort to reach the insurer. The garnishee there asserted the same claims here relied upon. The court said (343 Mo. 333, 121 S. W. [2d] 751):

"The policy at bar does not define the terms *bodily injuries, accidentally sustained* or place any limitation thereon. In view of the great variety of meanings of the term *accident,* and in view of the judgment defendant's and of the garnishee's construction or interpretation of the policy, and especially the interpretation of the garnishee, and in view of the failure to define the terms *bodily injuries, accidentally sustained* or to place any limitation thereon, it is reasonable to say that an ambiguity exists as to the meaning of the terms *bodily injuries, accidentally sustained* as used in the present policy, and when such situation exists, the insuring contract will be construed in the most favorable light to the insured. In the present situation, we rule that the occupational disease of silicosis acquired by Tomnitz was a *bodily injury, accidentally sustained* within the meaning of these terms in the policy."

The Missouri court of appeals held to the same effect in Blanke-Baer E. & P. Co. v. Ocean Acc. & Guarantee Corp. (Mo. App.) 96 S. W. (2d) 648; Beehler Steel Prod. Co. v. American Mut. L. Ins.

Co. 233 Mo. App. 841, 108 S. W. (2d) 985; and Row v. Cape Girardeau Foundry Co. (Mo. App.) 141 S. W. (2d) 113.

In Plecity v. George McLachlan Hat Co. 116 Conn. 216, 164 A. 707, the plaintiff recovered against his employer and an insurance company for injuries due to mercurial poisoning resulting from his employment. The employer had been insured by several different companies over the period during which plaintiff was in its employ, and the controversy on the appeal was entirely one between the insurance companies to determine upon which rested the obligation to discharge the compensation due the plaintiff. All of the policies contained the notorious seventh clause so common in these policies. The court stated (116 Conn. 223, 164 A. 708):

"The form of the seventh clause suggests that it was adopted at a time when our Compensation Act covered only accidental injuries and it is the apt way to determine the limits of the liability of the insurer as regards such injuries."

The court also stated that the word "accident" as used in the policy must be taken to mean the conditions of employment which produced the mercurial poisoning. It held that any and all insurers who carried the risk over the entire period of employment which brought about the final incapacity would be liable for the compensation awarded, thus construing such an injury as one coming within the terms of the policies.

The case of Updike Inv. Co. v. Employers L. Assur. Corp. Ltd. 131 Neb. 745, 270 N. W. 107, decided by the Nebraska supreme court on November 27, 1936, involved a policy of liability insurance almost identical with those involved in the instant case. After a suit for negligence in failing to furnish a safe place to work resulting in personal injuries to an employe and refusal of the insurer to defend upon the ground that the policy did not cover the injuries involved, the employer commenced an action under the declaratory judgments act to procure an interpretation of its provisions. Applying the rules that "where the language

employed in a policy of insurance is susceptible of more than one construction, that most favorable to the insured will be adopted" and that "where the insuring clause of an insurance policy clearly covers a risk, and a subsequent limiting clause does not clearly exclude it, such risk will be deemed covered by the policy," the court in considering what was an "accident" said (131 Neb. 750, 270 N. W. 110):

"The term 'accident' has many meanings, and when used in a contract of indemnity insurance, unless otherwise stipulated, it should be given the construction most favorable to the insured. It is true that, generally, accident insurance policies provide for risks only where the insured suffers an accidental injury by external violent means. There is in the policy in question no attempt to define the term 'accident.' Consequently, the meaning of the word most favorable to the insured should be accepted.

"In Chapin v. Ocean Accident & Guarantee Corporation, 96 Neb. 213, 147 N. W. 465 [467, 52 L.R.A.(N.S.) 227], it was said (at p. 217): 'The word "accident" is susceptible of and has received many definitions, varying with the connection in which it is used. It is: "An event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event; chance; contingency; often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; casualty; mishap." ' This definition is quoted from Webster's New International Dictionary. In the opinion it was further said: 'As used in an indemnity policy such as this, we are of opinion that the word "accident" means an undesigned and unforeseen occurrence of an afflictive or unfortunate character resulting in bodily injury to a person other than the insured.' Since this is an ordinary meaning of the word and is more favorable to the insured, under the principles above quoted such definition must be accepted as the meaning of the term, as used in paragraph seven of the policy in question. We think it necessarily follows that the claim made by Eunice Roth

in her petition may be properly designated as an accident and that it is covered by the insurance policy."

Other cases supporting the plaintiff's contention are American Mut. L. Ins. Co. v. Agricola Furnace Co. 236 Ala. 535, 183 So. 677; Victory Sparkler & Specialty Co. v. Francks, 147 Md. 368, 128 A. 635, 44 A. L. R. 363; Bosworth v. Metropolitan L. Ins. Co. 114 W. Va. 663, 173 S. E. 780; King v. Travelers Ins. Co. 123 Conn. 1, 192 A. 311; H. P. Hood & Sons v. Maryland Cas. Co. 206 Mass. 223, 92 N. E. 329, 30 L.R.A.(N.S.) 1192, 138 A. S. R. 379; Aetna L. Ins. Co. v. Portland Gas & Coke Co. (9 Cir.) 229 F. 552, L. R. A. 1916D, 1027.

Of interest is the case of Globe Ind. Co. v. Banner Grain Co. (8 Cir.) 90 F. (2d) 774, decided by the circuit court of appeals, eighth circuit, on June 12, 1937. That case originated in this state. Clark v. Banner Grain Co. 195 Minn. 44, 261 N. W. 596. It was predicated upon the alleged negligence of an employer in failing to provide its employe a safe place to work and to furnish proper and adequate ventilation, resulting in injury to the employe's health. After an adverse judgment the Banner Grain Company sued the Globe Indemnity Company on its policy of liability insurance. The circuit court of appeals, Booth, Circuit Judge, in affirming a decision against the insurer, quoted at some length from the memorandum attached to the findings of Judge Nordbye. It reads (90 F. [2d] 781):

"That the tetrachloride poisoning of Clark was a mishap that was unexpected and unforeseen seems clear, and it is fair to assume that the jury found that, by its insidious attack upon the membrane and lining of Clark's lung, and that time that elapsed before any injury resulted, the happening to Clark was distinguished from the occurrence contemplated by the definition in the Minnesota Workmen's Compensation Act. * * * the jury, under the evidence, concluded that the happening to Clark was not an accident that occurred suddenly and violently, and which produced at the time injury to the physical structure of the body, all of

which is contemplated by the definition of accident in the Workmen's Compensation Act. * * * However, the jury's verdict in the Clark case must be limited to a finding that the happening resulting in an injury to Clark was not an accident as defined under the Workmen's Compensation Act, and such finding of the jury cannot be extended or enlarged to a finding that the occurrence was not an accident within the unrestricted and unlimited definition of the term 'accident' as it appears in the contract of insurance that was entered into between the parties."

Silicosis or pneumoconiosis is not recognized as an occupational disease under the Minnesota workmen's compensation act. If it were, Golden's injuries would have been compensable under the act. Regardless of the nature of the malady he suffered and of its medical term, it could have been prevented by observance of the statute. The cause was the negligence of the employer in failing to provide proper ventilation for the carrying off of fumes and dust. There are many cases holding that injuries resulting from negligence of a like character do not come within the classification of occupational disease. Victory Sparkler & Specialty Co. v. Francks, 147 Md. 368, 128 A. 635, 44 A. L. R. 363; Pero v. Collier-Latimer, Inc. 49 Wyo. 131, 52 P. (2d) 690; Birmingham Elec. Co. v. Meacham, 234 Ala. 506, 175 So. 322; Polson Logging Co. v. Kelly, 195 Wash. 167, 80 P. (2d) 412; Gay v. Hocking Coal Co. 184 Iowa, 949, 169 N. W. 360; American Mut. L. Ins. Co. v. Agricola Furnace Co. 236 Ala. 535, 183 So. 677.

Of the cases relied upon by defendants, United States Radium Corp. v. Globe Ind. Co. 13 N. J. Misc. 316, 178 A. 271; Belleville Enameling & Stamping Co. v. United States Cas. Co. 266 Ill. App. 586; and Utica Mut. Ins. Co. v. Hamera, 162 Misc. 169, 292 N. Y. S. 811, all hold that policies containing provisions similar to the ones here involved do not cover occupational diseases. The meaning of the term "accident" is not discussed in any of them, nor are they treated from that angle. There are other cases seemingly in conflict with the view I take and with the cases upon which

plaintiff relies. Taylor Dredging Co. v. Travelers Ins. Co. (2 Cir.) 90 F. (2d) 449; Billo v. Allegheny Steel Co. 328 Pa. 97, 195 A. 110; Jackson v. Employers' L. Assur. Corp. 139 Misc. 686, 248 N. Y. S. 207. Reconciliation of the cases seems impossible.

It occurs to me that when the insurers agreed, as they did, "as respects personal injuries sustained by employees * * * *to indemnify* this Employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries," they clearly agreed to protect against loss for injuries of the kind sustained by Golden. Absent paragraph 7, there would be no question about it. If by the inclusion of that paragraph and particularly the word "accidents" therein the companies injected ambiguity into their policies, as they did, they subjected themselves to the application of the rule requiring a construction most favorable to the insured. Applying that test, I find no difficulty in reaching the conclusion that the policies covered the injuries sustained by Golden. But even if we were to hold that no liability exists unless the injuries were of such a nature as to be termed an "accident," I am of the opinion that the process by which Golden's lungs were injured, by the slow infiltration of silica, is as much an "accident" as an injury caused by pressure or crushing. The result is the same.

I agree with the trial court that recovery should be had against both defendants. We said in Golden v. Lerch Bros. Inc. 203 Minn. 211, 215, 217, 281 N. W. 249, 251:

"Plaintiff [Golden] was exposed to dust containing silica at least from the time of his employment in 1917 until August 8, 1929, * * * Over a period of more than 12 years plaintiff was subjected to the inhalation of large quantities of dust, much of it containing silica. * * * Plaintiff was exposed to this situation on an average of from two to three hours each day and from six to seven days per week during the seven to eight months of operation in each year of his 12 years' employment by the partners.

"The causal connection between this situation and plaintiff's subsequent ailments is, we think, adequately supported."

The tort was continuous over the period covered by the two policies. Both companies agreed to indemnify the employer against loss "by reason of the liability imposed upon him by law for damages on account of such injuries." The insurance was against liability, and liability was imposed upon the employer in the main action. It was not necessary to show the extent of damage during each period. Plecity v. George McLachlan Hat Co. 116 Conn. 216, 164 A. 707; Pete v. Lampi, 162 Minn. 497, 203 N. W. 447; Fabrizio's Case, 274 Mass. 352, 174 N. E. 720.

The order appealed from should be affirmed.

HILTON, JUSTICE, and PETERSON, JUSTICE (dissenting).

We concur in the views expressed by Mr. Chief Justice Gallagher.